2012-11-05 APPLE v. SAMSUNG ELECTRONICS We have this problem come up frequently, that we have a lot of material that's designated as confidential. It creates a variety of problems for us, some for you. And this is a case in which, as I look through the materials, it's not clear to me that this is glow-in-the-dark type protectable material. And with this, without trying to be too specific and get into the material itself, I would say it falls into a couple of categories. We call it the survey-type evidence, surveys done that encompasses matters like market share, matters such as reason that purchasers purchase things. These are all matters that are pretty important, it seems to me, to various issues, at least potentially important to various issues in the case, that we would, for example, either want to inquire about, discuss here in open court, or ultimately put in an opinion. Another area, perhaps less sweeping in its implications, but nonetheless a potential area, the evidence regarding licensing activities, evidence, well I mentioned the market share evidence, financial evidence of that sort, without getting into what the profits of a particular company were in a particular year, which is the kind of thing that companies often are very sensitive about, these do not strike us, I think I can speak for my colleagues on this, as being core confidentiality concerns. Now, you all, if you can, we would very much appreciate it if you can tell us that either globally or with respect to any of these categories, whether you're prepared to waive the requests for confidential treatment of these materials, and if you're not prepared to do that at this point, we will make a request that you promptly inform the court of which of the materials you are willing to waive and which you want to insist on maintaining confidentiality with respect to. And as to the latter, we would want a detailed explanation for why these materials are sensitive, and we would feel free to decide that the explanation is not sufficient to continue to treat these as confidential. Now, that's the way we see it. Why don't you tell me how you see it. Let me begin, Your Honor. I think we see it your way in terms of the importance of the issues and the importance of the underlying evidence. In terms of the AFL information that's at issue in this appeal, the hierarchy of concern would be where we have third-party confidentiality obligations, where we are under an obligation to assert to you the importance of the confidential treatment of the information in question. And then beyond that, I would want to look granularly at the specifics. I think we can talk in this argument about that information in a way that's satisfying for oral argument purposes, and I would welcome the opportunity then to follow up in terms of what might go into an opinion with any more specific identifications. All right. I'm not sure I understand exactly what the implications of that are likely to be, but maybe that's something you need to go back and just look at things with specificity. But what we're looking for is for you to use a very sharp pencil in striking out material that does not fall at the highest level of your hierarchy. Understood. Ms. Sullivan? Your Honor, from SAMHSA's perspective, we agree with Your Honor that many of the designations of confidentiality by Apple are excessive. And in particular, we agree with respect to consumer surveys, market share evidence, and licensing history evidence. But we are prepared today, Your Honor, to respect the existing designations by referring to that confidential evidence only by broad and vague descriptions and references to the pages of the brief where the confidential information is referenced. And that way we don't need to get into any danger zone today in the argument. But we would certainly welcome Apple's de-designating some of those designations after the argument. Well, of course, we don't know for sure who designated what, but I'm willing to bet that there's at least some of the material, judging from what it is, that Samsung designated. And I think you probably know the material I'm talking about in connection with one of the patents. So I would want you to engage in the same exercise, if you would, to make sure that if there is anything which is important to Samsung to maintain confidentiality, respect to that you identify it. And you don't have to do it now, obviously, but promptly. And let us know what it is that, in any opinion that we might write, that we should not make allusion to, at least specifically. Yes, Your Honor. On behalf of Samsung, we'll be happy to undertake that effort. And is it sufficient to inform the Court by letter of our response to your question? Sure. That's what we had in mind. Now, as far as time, do you have anything else in substance? No, I just wanted to confirm specifically, as it relates to today, that to the extent that you're talking about third-party confidentiality agreements, that would relate only to the 381 and only to the irreparable harm question? It relates specifically to licenses. Okay. That's what I thought. Okay, good. As far as timing, I don't want to put you in a squeeze, but this is a case that needs to move fairly quickly. What is a time that you would feel comfortable getting back to us? A little on the short end of comfort. On the short end of comfort, Tuesday, Your Honor. That's acceptable. Tuesday? Very well. Thank you. Close the business. Well, I was actually prepared to extend the comfort zone until next week. Should we propose Friday? Friday will be fine. Thank you. All right. Let's move to the merits. I'm just thinking about some associates that they're going to have. Absolutely. I can see the law clerks up there in pain on behalf of the associates that would be working. Okay. As far as timing goes, we are not likely to hold you strictly to the timing, unless you both want to submit on the briefs, which I doubt. So don't worry unduly if you find yourself running short of time. We'll allow enough time to allow the arguments to be fleshed out. So, Mr. Chickas. Well, Your Honor, I'd actually like to start with the question of urgency and speed, because we are in a market in which the relative market shares can move very quickly, where the competition is fierce, where who's up today can be very different from tomorrow, and it is that urgency and speed which underpins much of our argument to you today. So let me ask my first question about the urgency and speed, or lack thereof, that Apple exercised in seeking the preliminary injunction in the first instance. What, in your view, was the first date in which it would have been all things, the table would have been set so that you could have come in for the preliminary injunction that you ultimately asked for on July 1, 2011? The table was set with Apple going to Samsung, and the undisputed evidence is that Apple told Samsung, stop copying. That was in the summer of 2010. There were several rounds of discussions. In each of those discussions, Apple told Samsung, stop copying. There was a hope that that would be sufficient and that the next release of the Samsung products would reflect a change of direction. Okay, and that concluded in the fall, in November. The discussions concluded, but the evidence that the hope was not to be validated was serially as these products came out in the winter and spring of 2011. And there are a couple of critical points about this because I think as a reviewing court, what the Federal Circuit says about negotiations and the argument of delay is critical. It was the right thing to do for Apple to go to Samsung and say, stop, stop your copying, and to give that a chance to work out. It was the right thing from the standpoint of the relationship of big companies to each other. Okay, even accepting that, you filed your complaint on April 15th and you didn't seek the preliminary injunction for a number of months thereafter. The products were released serially. You may recall from the underlying record that we obtained an expedited discovery into products that were yet to be released, and then they came out month by month. One was already on the market. The new version came out after we filed the complaint, and then there was yet another one. And so that's at the table. Plus, frankly, the work to prepare a proper preliminary injunction motion and to do the analysis and get it right. You said that we had these dates at your fingertips, but the four devices that are at issue here, the Galaxy S4G, when did that come out? Let me find that, Your Honor. Well, I'll tell you what. I think it was February 23rd. Well, okay, February 23rd. And did either of you know the date of the Infuse 4G? The Infuse, I believe, was in May. May. This is 2010. These are all in 2011. I'm sorry, 11, yeah. And the Galaxy Tab? The Galaxy Tab was June 8th. Okay. Okay. And I guess there was that fourth phone, the LTE. It's involved in the treatment and stuff like that. Let me also, just to add on to that, the Galaxy S is also implicated, and that came out in March 2010, correct? Well, the Galaxy S is not a target of the preliminary injunction motion. The Galaxy S4G, the Infuse 4G, the Droid Charge, and the Galaxy 10.1. Okay. Okay, go ahead. On your issue of urgency, though, do I understand that the current trial date is July of this year? July 30th, yes. And there's no indication that Judge Crowe intends to move that? That's correct, John. Okay. That was an expedited date that you gave. Yes, we have expedited relief on trial on the merits, and one of their arguments is, of course, that should be sufficient. We know from experience, this court knows from reviewing the dockets that come up from district courts, that it's not the trial date that really controls, it's the date of resolution of post-trial motions and entry of an injunction. And as we chart it out, we're looking optimistically to late in the fall at best for the actual entry of an injunction. Of course, I suppose that things change after there's a verdict. For example, I don't know if I've seen this at a jury trial, but the circumstances may look different after there's a verdict, and presumably even if there has not been a preliminary injunction entered at this point, it could be entered immediately at the end of trial. There wouldn't be anything wrong with that, right? I mean, the district court can always revisit the question of whether to enter, modify, or vacate an injunction. District court does have that authority, Your Honor. Part of our urging to you today is let's make sure we get the standard right. We believe this court should direct entry of an injunction now. I understand. We also believe this court should get the standard right, so when we get to that stage as to the rest of the products, the district court applies the correct legal standard in deciding whether a permanent injunction should issue. If there's a single issue that jumps out from the district court's opinion, it's that question of what is the standard for an injunction? After all, the district court found that there were two Apple patents that were likely valid and infringed, and that Apple would, in fact, be irreparably harmed by Samsung's sales of accused products, but then concluded that we hadn't met the irreparable harm standard because we had not established that the patented features drove consumers' purchasing decisions. And that's the principle basis for denial of the injunction on the two patents that were held likely valid and infringed. This new consumer motive hurdle threatens serious harm, not only to Apple, which is entitled to injunctive relief, but to the entire remedial scheme under the Patent Act. I'm sorry, go ahead. What alternative measure would you have the court use other than the fact that whether the consumers focused in on a particular feature? What alternative measure would there be to assess irreparable harm? The question on irreparable harm is a focused and narrow question. It is after a judgment on the merits against this defendant, will all of the injury that this defendant has caused the plaintiff be remedial in money damages? And the answer by the district court's own findings here was no, because what this market is so characterized by is these kind of network effects and downstream purchasing effects. I buy an iPhone today, I'm likely to buy an iPhone tomorrow. I buy a Samsung phone today, I'm less likely to buy a Samsung phone tomorrow. And those were the specific findings that the district court made on irreparable harm. When I thought you were... I'm going to ask the same question, I think. I thought you were heading down the road of addressing this whole question of nexus. But I wonder how far you go with that argument, because suppose that Chrysler decides they really like the spiffy design of Ford's cupholders in the backseat of their Focus. And they copy them, blatantly copy them. And that affects, let's say, no consumer. No consumer buys a Chrysler because those cupholder designs really are nifty. You wouldn't enter an injunction under those circumstances, would you? In the I4I case, we have a plaintiff seeking an injunction against a defendant, that is the Chrysler in your scenario, and the injunction entered. After findings of irreparable harm, I think we have to go through the steps and find out whether there is irreparable harm. And then we have to look at the balance of the hardships, which is where I think the force of your analogy might go. And we have to look at the public interest, where the force of your analogy might also go. Well, I think it actually goes to irreparable harm. In other words, you can say that any sales that were lost carry with them all sorts of additional losses that are incalculable. Market share, loyalty, dilution, those kinds of things that are really difficult to calculate. And that would be irreparable harm if there were any sales that were lost. But since there weren't any, by hypothesis, in my example, no one bought a Chrysler because of the design, of the stolen design of the cupholders, then it seems to me very hard to say that that's irreparable harm within the meaning of the four-part test for injunctions. So let me add an element to your hypothetical then, because maybe I overlooked a critical step. I assume in your hypothetical that the plaintiff has lost sales and lost market share and lost downstream customers and lost licensing opportunities or whatever else this court has figured into the typical calculus of irreparable harm. And under those circumstances, the plaintiff should have a good shot at enjoining the infringing act. The sales of cars that have... Go ahead. Let's assume in your hypothetical they've lost all of this. But don't you have to show they've lost it because of the cupholders? No, you have to show because of the sales of the accused products. Ah, but you see, when you break the tie between them, the sales of the accused product, if you say the accused product is the whole Chrysler, there may have been purchases of... People may have been flocking to the Chrysler and leaving Ford in droves because Chrysler has neat ads or because they have a new engine. That does not seem to me to be irreparable harm of the sort that we're really focused on, which is irreparable harm from the act of infringement. Because you're saying as long as the product which incorporates the infringing feature is taking sales away from, in this case, Ford, that's enough. But I mean, can that possibly be right? It can be, Your Honor, because the act of infringement is the selling of an infringing product. Under the Patent Act, we don't look at infringement at the granular level that you're suggesting. We look at whether the defendant has made, used, and sold or imported infringing products. And in the scenario, albeit an extreme one that you have posited, the defendant is selling an infringing product. And the defendant should be, as I understand the hypothetical, which is not our case. I understand. I wanted to see how far you were going with that. Is there anything in between the two extremes? I mean, you say, all right, as long as the feature's in there and we've lost any sales, then that's the end of our showing that's necessary. The other extreme is this nexus that shows that purchasers bought it solely because of that or that was the primary reason that they bought the product. Is there something in between? There is something in between. And part of the challenge here with the district court's decision is that the district court seemed to have different standards in mind for what the nexus might be. And we see this question coming up in different contexts, in remedies and in commercial success. What exactly, how tight is the causational tie? We know that design is important here. It would be surprising if people bought a really bad cell phone with gorgeous design, and in that sense, design was the singular but for cause of purchasing decisions. We know that it is a combination of elements that go into any consumer purchasing decision. You have to have the price right. You have to have the features right. We do know from the record evidence and from findings the district court made that design is an important factor. And we just know it from our everyday experience with these products. What is the evidence with respect to the Snapback feature? Well, the evidence there is confidential Samsung documents which indicate the importance of this feature to them. To them? But is there any evidence that indicates the importance of the feature to the consuming public? There is no record evidence that a purchaser made a decision because of Snapback. We do know that consumers make purchasing decisions based on the elegance of the user interface. And this is an element of the user interface. So there is a kind of, is this visible to the customer in an important way, standard that one could apply here and that that feature would meet. We're not talking about something deep into the internals of these products. We're talking about a visible feature. So that's a possible way to distinguish between the trivial and the consequential. But to ask a plaintiff who has a valuable patent on an innovation like that to go out and prove consumer purchasing decisions based on that would set the hurdle far too high. So I'm not clear on your response to Judge O'Malley's initial question which is so what is the middle ground standard? In your view, and maybe you can answer that by suggesting what standard do you think the district court actually applied here? Are you suggesting that she did the but-for, that they have to prove 100% but-for in order to show irreparable harm? Pretty close. I wouldn't say 100%, but pretty close to but-for because if you look at her discussion of what happened on the tablets, on the iPad against the tab 10.1, she gets very close to saying that we have proven irreparable harm. What are the elements there? Only a two supplier market. Robert Bosch addressed that. You can have other competitors out there. You don't have to have a two supplier market. And then she cites an internal document which says that design is everything. Well, that can't literally be right even though the document says that. So what's your middle ground? Design isn't everything. Do you have to at least have established that it was a primary factor, that it was a factor of some sort among any number of factors? Is that the test you're at least moving to the middle ground here? I think in answering for possible middle grounds that we've now laid out kind of the gray scale here, the possibilities, but I think that barring extreme cases which we believe should be addressed by balance of the hardships and the public interest factor, ordinarily if a plaintiff proves in a competitive, a close competitive market, what Robert Bosch says, we start with, are we looking at close competitors? We look at whether there is harm that the plaintiff has proven that there is irremediable harm after the case is over. And here we prove that very concretely. It wasn't a kind of diffuse amorphous proof. It was their network. Yeah, but as Judge Bryson said a few minutes ago, that harm could have been for reasons completely distinct from the infringement. It could have been because the products were different or some other reason. So it can't be just harm. In no case has this court said that a plaintiff must show a tie, a nexus, between the infringement and the irreparable harm. In Robert Bosch, for example, there was no discussion of, well, this patent is what drove sales of the... But it wasn't the same kind of product. It was a much easier circumstance than Bosch. It didn't have this kind of situation that we have where Judge Bryson's hypothetical could fall into with multiple, multiple features. So you can take Bosch to a point, but it doesn't get you all the way there. And on the facts, I understand that. But I think as we step into this question, we should understand that we are going into uncharted territory. And in this particular case, on the facts, we know that design is important. We know that the user interface is important. As against the cup holder and the Chrysler, I suggest to you that there's a vast difference between those two scenarios in the product in question. And given that starting point, it should not be the burden on the plaintiff, on the patentee, to prove this kind of a nexus. You argue both that the nexus isn't necessary, and then you argue, at least in some places, that even if it were, there was enough evidence as to that. So to which of the patents do you believe that if we were to adopt this kind of nexus requirement that the judge up here would have imposed, that you satisfied that? In the case of all of them. So on the iPhone design patents, we showed... Why doesn't it surprise me that you said that? LAUGHTER On the iPhone design patents, design is important to the iPhone. That's not just something we all know. It's something that we proved. On the tablet, of course, the district court has concluded that that was the case, that design was an important driver of sales. And on the 381 from the Samsung documents, we know that it was judged by them to be very important to adopt that feature. Engineers, though, have a way of getting excited about things that no one else is excited about. Pretty extraordinary evidence. Pretty extraordinary evidence. I don't want to over-describe it for present purposes. I understand. But if you read the document, it's not just, oh, by the way, we need to do this. It's in glowing red lights, we need to do this. And that, in turn, is driven by, in the documents you can see, driven by customer feedback about what they like and don't like. So that's pretty good evidence. The problem with it as a standard is, I think we got, frankly, as a plaintiff, we got a little lucky here in finding documents like that. And I would be cautious about imposing that as a burden in a preliminary context where discovery may be limited. Do you read Judge Koh's decision as imposing a burden of producing consumer survey evidence even at the preliminary injunction stage? It could be. She highlights that as a piece of the missing evidence. And once again, we urge the court to be very cautious about asking for consumer survey evidence. It's not just that it's survey evidence, which I think we could all have our views on just how good that evidence is. But we're talking about preliminary relief. We don't, we're trying to predict what is going to happen downstream based on the tea leaves that we have, tea leaves from the past, tea leaves from the moment that we're able to gather in the moment when we're preparing preliminary injunction motions. And so to ask for consumer survey evidence would be, I would suggest, would be ill-advised. If I could turn briefly to the 889 tablet patent. Right. Here the district court made a different kind of legal error. It had to do with the articulation and application, but I want to focus on articulation, of the standard for primary reference. In the opinion, the district court says... This is the Fiddler tablet issue? This is the Fiddler tablet issue, yes. Is that a factual conclusion or a legal conclusion? Well, it's a mix, right? So there's obviousness that it's a legal conclusion. There's some factual judgments. The court says you do this instinctually. And so it's a kind of review of an instinctual judgment. But the standard as articulated, I think, is where this court has its most distinct role. The district court says what Apple is basically saying is, look, basically the same is substantially the same. And that can't be right, the district court says. And then retreats all the way to, am I in the same product category? Do I have a tablet out there that's thin with a big screen? Well, Fiddler is thin with a big screen. Does that make it a primary reference? Is that what basically the same means? It can't be because, of course, Fiddler has the frame around it. It's not edge-to-edge. It doesn't have that smooth pond look that we all know is inherent and essential to the overall visual appearance of the iPad. Even if we were to agree with you, where does that lead us in terms of this case? I mean, there are other references in the record. The district court selected this one as the primary reference. So do we send it back for her to reevaluate? I mean, if we were to agree with you that it's a matter of law, she must construe what primary reference is. It would require her to go back and look at the other references and see if another one works better. What this court should do, Fiddler was featured below as the lead reference by Samsung. This court agrees with us that, as a matter of law, the district court got the obviousness analysis right because there's also the question of the combination with Compaq HP. Would you really take Fiddler and this clamshell device that happens to have glass that goes up to about a half inch from the edge? Would a skilled designer looking at Fiddler and HP come up with the iPad design? You don't even need to get to that point if you conclude that Fiddler is not an appropriate primary reference. Exactly. I'm trying to give you a couple of ways to decide this as a matter of law. If you were to decide that, and then Samsung has proposed its alternative grounds, I think this court can look at those references and say they aren't even primary references for the tablet. I'm sorry. Go ahead. I'm here. I find articulating standards that are borrowed from utility patents and applying them in design patents to be tricky business. So help me articulate. You did a moment ago but started quickly. Articulate for me how you would analyze the proper approach to deciding whether a particular asserted primary reference qualifies as such. I think the verbal formula, basically the same, is a good starting point. Basically the same. That covers a multitude of senses. It does. And of course we're talking about visual impression and we're talking about the application of words to visual impression. Basically the same compared to what? They're basically the same compared to, let's say, the Samsung device, regardless of what you think about infringement. They're not the same. So how do I know? It's always the problem with design patents. It's the compared to what problem. Let me start with a threshold point. Another lurking policy issue in this case is the protection we're going to give to beautiful product designs. And I wanted to say that and leave that with you because we haven't argued it as vigorously in the briefing as one might. But we are talking about products that were recognized as beautiful because of their industrial design. The direct answer to your question is that it seems to me when we're talking about obviousness, which I think is what you're driving at, in the design context we need to think about it as a basically similar reference to which you might attach another reference to come up with the overall design that is in the design patent. Not a blending of completely different design philosophies. And that's from the obviousness error in combining these references. I understand that part of it. Each of these steps is hard, but that's maybe a little easier than the first step, which is how do I qualify or disqualify a particular prior art design as a primary reference? Give it this title and put it in the position of being the starting point. What's the line? Substantially the same doesn't give me a whole lot of comfort. Is there any more precise way to articulate the difference between a qualifying primary reference and one that doesn't qualify? I don't have a complete answer to your question. I think I have a partial answer. What you have to have in mind in looking at the primary reference is what might the additional reference add to it to come up with the claimed design from the standpoint of a skilled designer. So just suppose for a minute that we had a design patent on the iPad, and the design patent also had the ornamental design of, say, a plug. So the overall design patent is the iPad with a plug attached to it. Now you might look at a prior art, very close tablet reference, if there was one out there, and you'd say, well, that's pretty close to the tablet piece of this. Now let's go look and see if there is an additional reference that combines the plug with it. Because I could imagine a skilled designer thinking, okay, tablet, plug, those two could go together. That strikes me as the kind of obviousness analysis we should be thinking about when it comes to design patents. And, of course, what we have here with Fiddler and HP Compact are vastly different design ideas, design principles, design concepts. So on the facts here, I think we have an easy line to draw as a matter of law. Putting myself back into my former role, if I read Judge Clevenger's opinion in Durling and Ice, and it says the judge can instinctively figure this out, that's one where I would think perhaps the Court of Appeals would give me some deference on my instinct. If that's the standard, why shouldn't we defer to the trial judge here? Again, I think it's because the articulation of the standard and the verbalization of why it instinctually felt like a primary reference to the district court evidences the legal error. It was a definition of Fiddler as falling within the category of tablets. And that can't be enough. There has to be an identification of Fiddler as basically the same because the design of Fiddler is basically the same. And that's the legal error here. Instinctually, it's an unfortunate word because it suggests that it's unreviewable. And we do have to have reviewable standards here. And that is why we end up falling into the necessity of doing verbal characterizations of all of this. Because somebody has to figure out what was the underlying reasoning. The underlying reasoning here on primary reference was legally erroneous. If you cure that error on the 889 on the tablet design, then we have irreparable harm. Found we submit on too tough a standard, too difficult a standard for patentees typically to meet, but we have all the elements necessary for an injunction. And we also have an injunction. I don't recall that on that issue, I don't think she touched on the other issues, right? Balancing the hardships and so forth. She did not at length, that's correct. But interestingly, Samsung did not propose alternative grounds for affirmance on that. So you have nothing in front of you about the balance of the hardships and the public interest. But what we do have is strong evidence that here the defendant did exactly what that great quote about building your business on the basis of infringement is all about. Because we do have this moment in court in which the judge held up the iPad and the Samsung tablet and counsel for Samsung couldn't distinguish the two at the distance that we are now. We do have the evidence that Samsung changed its products when the iPad came out and then we have the documents that you have seen that evidence the intentionality behind Samsung's conduct. But we've gone quite a ways over time, but it's been useful. Why don't we hear from Ms. Sullivan. Thank you very much. Ms. Sullivan, a comparable amount of time. Ms. Thomas, if you could add the time in the event that you need it. Thank you, Your Honor. Kathleen Sullivan for Samsung. I'd like to begin by reminding us that we are here on an appeal of a denial of a preliminary injunction. So, of course, we're looking to the district court's determinations with deference on abuse of discretion review. And there is no clear error that would warrant reversing the district court's decision, especially not where trial is set for July 30th on an expedited schedule at Apple's request. And Apple's given no reason why this court should provide interim relief in the meantime. This is especially so because, as Judge Prost pointed out, Apple delayed in seeking this preliminary relief. Judge Prost referred to March 2010. That was when the Galaxy Vibrant came out. And Apple can't point to any material differences between the Vibrant and the current Galaxy S4G that's accused. If you look on page 34 of the red brief, you'll see they're the same thing. So Judge Prost was correct that Apple has really sat on this question since at least March 2010. But if your friend is right that the district court applied at an entirely incorrect legal standard in what evidence was necessary to establish irreparable harm, then there's some point going forward. So why don't we address whether or not that was correct or not. Absolutely, Your Honor. And let me begin with the standard on irreparable harm that Judge Coe did apply, and it is the correct standard. It appears in her opinion at appendix page A33, where she refers to a causal nexus. And she says, and this is, I think, Judge O'Malley, your intermediate standard, she didn't go so far as to require that the infringement of Apple's design concepts was the solitary or exclusive but-for cause of the lost sales. She required something more moderate, which was a causal nexus. And she found that Apple had failed to provide any concrete evidence of any causal nexus between Samsung's supposed use of Apple's design patents, on the one hand, and the lost sales. So with respect, Judge O'Malley, I think my friend's answer to your question, what rule was he proposing, he was proposing an untenable rule of presuming irreparable harm from lost sales if they have a design patent that they practice. And that cannot be the rule because that, of course, was undone by eBay. How do you show the nexus without consumer survey evidence? Well, that would be the first thing. Judge Coe found an absence of any kind of evidence. She, first of all, looked to the absence of any evidence in Apple's own testimony, Apple's own 30B6 witness. When asked, can you see any evidence that Samsung's supposed practice of Apple's design patent has caused any erosion of Apple's brand or design distinctiveness, she answered, no, I have no evidence. That's at page 8667 of the record. She then said you didn't come forward with any consumer surveys. She didn't say it was required, but certainly Apple didn't come forward with surveys showing dilution. Apple could show this by any form of ordinary evidence. The point here is they relied on a presumption and they came forward with none. They thought the rule was lost sales produces a presumption that it was the design patent's practice that caused the lost sales. Now that can't be the rule. To go back to Judge Bryson's point earlier, design patents are of narrow scope. They cannot foreclose legitimate competition. This court's made clear that they're not to be read broadly, and Apple's own construction of their design patent is so broad. They claim to have a monopoly on hand-held, rectangular, rounded-cornered portable devices for reading media. But is there really a dispute about copying here, though? We do dispute copying, but copying isn't relevant to the question here. The question is, is there substantial similarity? But just to go back to the point about irreparable harm and what you would need to show, Apple was obliged to show, and it did not, that it was Samsung's practice of the design patent that led it to gain market share at Apple's expense. Suppose Samsung was simply practicing the prior art, the Japanese 638 patent, the sharp Japanese 638 patent. That's the patent on which Judge Koh, correctly, and I don't hear it challenged here, found the 087 patent likely invalid as anticipated. Well, Samsung was free to practice the Japanese sharp 638 patent, and Samsung was free to practice all the unclaimed design elements, other aspects that aren't claimed, although Apple does try to claim almost everything in the design. It has to be allowed that there be legitimate competition. So the causal nexus requirement is what distinguishes legitimate competition, it's, for example, practicing the prior art or the unclaimed features or just good marketing, from the infringement. But how much is enough? I mean, it's hard to envision this outside of consumer surveys, but you've got two questions with regard to consumer surveys. You've got the range of, it's one factor all the way to, it's the only factor versus primary, and then you've got, in consumer surveys at least, what's enough? 10% of potential customers said this versus you need 90%. How are we supposed to decide what the limits are? We respectfully submit that the standard should be at least primary cause, at least proximate cause. Even if you don't require it to be a solitary or exclusive cause, the use of the design patent, certainly it's Apple's burden to come forward and show that the reason why it's losing market share, supposedly, is the practice of the patent. What do you mean by primary cause? So say you have a customer that all things being equal, if this product is the same as this product and that the only difference is, say, the bounce back feature or the snap back feature, that all things being equal, I would like the one with the snap back feature. Is that enough? Certainly not one consumer. Well, if you had evidence of that. Your Honor, with respect to the snap back, that is Judge Bryson's cupholder. There is absolutely no evidence that any consumer as opposed to any engineer has ever said I'm going to purchase something because of the snap back feature. So they presented no evidence on that from consumer surveys. So that really is the cupholder. But Samsung really thought that it was important, didn't it? I'm sorry? Samsung thought that was a very important feature. Well, Your Honor, that takes us into materials that are designated confidential, but I think the key point is that it doesn't matter what Samsung or its engineers thought. What matters is what the consumer thinks. Well, it may not be dispositive, but it's interesting and relevant. But, Your Honor, there are alternate grounds for you to uphold Judge Koh on the 381 patent, and there are alternate grounds on all of these. And I would just call Your Honor's attention to the 28J letter we submitted because in her claim construction of Wednesday of this week, she found a construction of the prior art that we submit renders the invalidity argument based on anticipation very strong. So putting that aside, going back to irreparable harm, Your Honor, the key point here is there is no evidence. We're on a preliminary injunction denial. We're deferring. There is no evidence on this record, no evidence, that consumers were basing their decisions to buy a Samsung product or to give up an Apple product at the initial stage on the patented design features. Now, let's go back. In your view, what would be a sufficient percentage? I mean, let's say there were evidence of 10%. Where do you draw the line in terms of what percentage? Well, Your Honor, it's Apple's burden to show likelihood of irreparable harm. Likelihood of irreparable harm suggests that we're at least at a 51% threshold. 51% loss of market share? No, no, no. 51% likelihood that this feature was the reason why you purchased this product. Not at all. No, but my question is that… The first question I think went to how much loss of market share would you be saying was insufficient to constitute irreparable harm if you could demonstrate that a 2% loss of market share was attributable to the particular design feature. Would that be sufficient? That would not necessarily be sufficient. You would have to show that the lost design feature caused irreparable harm that couldn't be compensated some other way. We're going to suppose that. That those people were… The evidence was that once they went over to the competitor's product, they would never come back to Apple and they'd be buying peripherals and whatever. That might be a different case. But with respect to a very small… That might not be enough. Irreparable harm as to a small percentage might not be enough. Irreparable harm as to even with the past dependency argument that it will have future consequences. But the judge accepted that, right? Didn't the judge agree that there were significant downstream consequences to the purchase? Obviously not with respect to what motivated it. She did, Your Honor. We think that was… We don't concede that that was correct. But she did find, and here just going back to the question of what we should be deferring to here, the district court found that there was no concrete evidence. This is a factual determination that should get clearly erroneous review. She found that in this record, there was no evidence, no evidence of a causal nexus between the design patent features and the lost market share. In that case, you have an easy affirm. I recognize that you're trying to set a standard going forward and let me disagree with my friends that this is not uncharted territory. The reason why a causal nexus is required is already set forth in the ordinary law of injunctions. Winter versus NRDC cited in our brief. And the key feature here is that an injunction has to stop the irreparable harm. It has to remediate it. Speaking of remediating irreparable harm, one of the things at least that was set in Bosch is that you can't decide the presence or absence of irreparable harm unless you determine whether or not money damages are in fact an alternative remedy. At least one district judge considered this issue and every time it comes up here, we seem to decide the cases on other grounds. But at least one district judge said, the problem with your argument is that it would be impossible to calculate the money damages if you have a multiple feature product. In that case, the judge said that that was indicative of irreparable harm rather than the other way around. So how would you calculate money damages for just one feature? Your Honor, with respect to the bounce back patent, there's evidence in the record that's currently designated confidential that suggests that Apple did view the bounce back feature as compensable because there's a licensing history. It's referred to in the red brief at pages 66 to 67 that suggested that even that one element was part of a compensation package. So we don't concede that anything here was incompensable by money damages. And Judge Bryson, that would be the rest of the analysis. You would have to show that for irreparable harm, that the design, patents, practice had a causal nexus to the lost market share that was also irreparable and incapable of being compensated by money damages. That would be the ultimate showing. Now, just to go back for a moment to the ultimate standard, we think that you have to show there's a causal nexus and we think with respect to a complex product. A smartphone is a bundle of patents. Obviously, it's a far cry from a windshield wiper versus the windshield wiper that was at issue in the Robert Bosch case. That was a utility patent case after a jury trial, so it's quite different from the preliminary injunction situation here. In this case, there was no showing that any of the design elements were the cause of the lost market share and there was certainly no showing that the bounce-back patent was any cause of a lost market share. So on this record, the total absence of concrete evidence is a factual determination to which you should give deference to the district court. Now, if I could turn to the Fiddler issue and the 889 patent, I'll just skip briefly over the 087 patent. There's an alternative ground on the 087 patent that it was anticipated by Sharpe's Japanese 638 patent. But 087, at least the ground that the trial court relied upon, the anticipation ground, that depends on our conclusion that the 087 only covers the front face and does not show anything. That's right, Your Honor, but that's Apple's own construction. If you look at the record at A996 and A1000, you'll see that Apple itself relied upon the facial front of the phone in its construction of the patent. But even if you take the side view, there are no material differences, and again, the district court found no material differences. You should defer to her. The front view discloses a bezel, a thin bezel. The side view discloses a bezel. If the bezel is a little bit curved, it doesn't make any material difference. But, Your Honor, I'd refer you to page A4693 of the record for an admission that's currently designated confidential, which says that basically the 087 is identical. Sorry, it says that the 087 is basically the same as the Japanese 638. So if you have any doubt about the district court, I refer you to the currently confidential testimony at 4693. But going to the 889 issue, I'd like to submit again that Judge Koh applied exactly the correct legal standards and that you've already settled, Judge Bryson, this court has already settled the standard even in the design patent context and it's done so in two cases, International Seaway and also in the Durland case, the furniture sectional sofa case. And the right thing to look for in the primary reference is does the overall visual appearance, the overall visual appearance, is it basically the same? The primary reference is the claims design. And Judge O'Malley, I submit that in answer to your question, that is a factual determination on which the district court should get deference. Yes, obviousness is ultimately a legal question reviewed de novo. But the underlying factual considerations, did the district court pick the proper primary reference and did she pick the proper secondary reference, those are factual determinations on which she should get deference. How do you respond to your friend's argument that, well, she may have said she picked a primary reference based on the Durland requirements, but then she actually said the reason she picked it is because it's in the tablet arena. That's not enough, is it? It's not, Your Honor, but that's not what she said. If you look carefully at pages A40 to 41, she describes at length an overall visual impression that's every bit as good as the overall visual impression that the Durland court prescribed. She describes at A40-41, at length, a simple rectangular tablet with four evenly rounded corners. The front screen is a flat reflective surface surrounded by a rim on all four sides. The back side is essentially flat. So she gives content to the overall visual impression and she looks to the Fidler tablet. Now, if you have any problem with the Fidler tablet as the primary reference, the 1994 Fidler tablet, I'd respectfully refer you to pages 54 through 56 of the red brief because that's where there's a whole host of other primary references that Samsung submitted and which are in the record, and Titantire allows you, you don't need to rematch... What you've already acknowledged is a highly factual question. It's a highly factual question. There should be deference to the district court on picking 1994 Fidler tablet, but if there were any doubt, I think Titantire makes clear that if there were multiple primary references in the record, it doesn't matter if the district court picked the right one. It is not thoroughly erroneous to have relied on the primary reference in the first place. And to combine it with the secondary reference, the HP Compact TC1000, we're not sure you needed to combine it because the Fidler already discloses really most of what Apple's broad construction contains, but if you need the extra element of the flat translucent glass screen that extends to the edges, it was proper and not thoroughly erroneous to look to the TC1000 to get that. So we don't think there's any problem with her obviousness analysis. Now on the point, and maybe I misunderstood, I recall your friend said that let's assume that we disagree with you on whether or not Fidler was an appropriate primary reference. Is it our job to just enter an injunction with respect to the tablet simply because the judge otherwise found irreparable harm and did not appear to address the other factors? Or I think he suggested that you didn't raise that as an alternative ground, and so therefore we go ahead and do it. No, Your Honor. We don't think you should reverse and remand here at all. We think you should affirm because her decision was aptly supported, and she did address, although in a fairly brief fashion, the other factors under the four-part test. But there's no need to remand here. You certainly can't reverse and direct entry of an injunction. This is a far cry from a case that would require that. If you did have any doubt... Well, why not? That's the question. Why not? If she found otherwise, if this were the exclusive basis upon which she relied for not granting the preliminary injunction, why do you not? Well, because you have in the record as it stands now alternative bases to uphold her ruling. And if I could, let me turn just quickly to the key one that we think is before you and which does go to federal circuit design patent law. And that is the alternative ground that Samson showed that it was more likely than not that the design patents, the three design patents, were invalid based on functionality. And with respect, we think that while Judge Koh didn't need to reach the question of invalidity based on functionality once she found no irreparable harm as to 677-087 and once she found obviousness as to 889, when she did get there, she didn't misstate the law. And we think the law is very clear from Ph.D. and Richardson that to find a design patent invalid as functional does not require that it be exclusively functional. It requires that it be primarily functional. Ph.D. talks about primarily functional. Ph.D. authorizes the district court to look element by element at whether the elements are functional. And if most of the elements are functional, the overall design patent is functional and invalid. And we think that the alternative ground of invalid on basis of functionality is an alternative ground on which invalidity could have been found as to the 889. So you have an alternative ground in the record. If you had any doubt about invalidity based on the functionality of these... And just to go back and review the argument, Sasson argues that nobody can have a monopoly on a handheld, flat-screened, portable, rectangular, round-cornered device for reading media. That's turning a mere concept into a patent. And design patents do not go that far. If you had any doubt that the functionality of these elements actually create likelihood of success on an invalidity defense, then the other error in Judge Koh's interpretation of functionality was she didn't construe the patents narrowly enough. The design patents, at a minimum, have to have all the functional factors filtered out in doing the infringement analysis. You would have to take out anything that's functional. Round corners don't snag. Rectangular shape allows you to read media. Flat screen enables the finger to glide. Lack of a rim allows the easy use of the flat screen. Flat back allows it to lie flat. We've denominated all of these features that make the design patents here, in our view, wholly functional. Other than one sentence in your brief, do you argue functionality in your brief? Yes, we argue functionality extensively. In your brief? There's one sentence and one footnote. About functionality of which patent, Your Honor? About functionality, period, as it relates to this appeal. No, we actually make alternative grounds arguments, Your Honor, at length. In fact, I'm glad you didn't think it was at too much length, Your Honor. But we do devote substantial pages of the red brief to the functionality alternative argument. And that appears both at the pages 39 to 42 and in the infringement section to pages 46 to 50. And our argument there, Your Honor, is that functionality is an alternative ground here. And it's extremely important, if you do reach this question, to clarify that under Ph.D. Richardson, well-established law of the circuit, under Amini, the question is, is the design patent primarily functional? Not is it exclusively functional. Not is the design dictated by function in the sense that there could be some alternative. The question which was asked in Ph.D., a footnote too, is are there alternative designs of similar utilities? If you could show an alternative design, you could show that you could have a hand-held triangular tablet or triangular phone, but that wouldn't be nearly as useful and it might cost more to produce. That doesn't defeat the argument that a patent is primarily functional. So with respect, Judge O'Malley, we do think invalidity based on functionality is an alternative independent ground for affirmance. But if there's any doubt about that, she should have construed the patents more narrowly. She should have stripped out, filtered out, all the functional elements. And what would have been left behind there would have been phones that have very serious differences. Our phones are very different from theirs if you strip out all their over-claimed, broad construction of the design patent. We also have... It's a little trickier than just stripping out functional features, right? Because you can have a device which has a variety of features that are functional, but they are also serving that function in a cleverly designed way. And that would be protectable, as long as you're not foreclosing the exercise of the same function. I mean, I suppose you could say to take the ultimate example of, well, it's a trade dress as opposed to a design patent. It's a Coke bottle. I mean, the Coke bottle is certainly a unique design, but it has that narrow area in the middle of the base that allows the hand to hold it conveniently. You could say, well, that's functional. But you're allowed to have some function. You don't just take that function and say, nope, disregard that, right? And that's not my understanding of our design patent law. Well, you would strip out the functional element and ask whether the remainder was primarily ornamental. Was the remainder after the hand-held center primarily ornamental? That's what a design patent protects. Well, I'm not sure that's right. I mean, you can correct me if I'm wrong, but I thought that what you want to foreclose is saying that you can have a design which has some functional aspect to it. I mean, these running shoes have all sorts of designs, all of which serve one way or another various functions. And you get design patents all over the place for those things. But what you want to avoid is something that serves only a particular function. That's in the trade dress area. I think it's also in design patents. Is it not? It is in design patents, Your Honor, but the standard that this court has set is primarily functional as opposed to primarily ornamental. That's why PHG, the medical label case, comes down against a preliminary injunction and in favor of a potential finding of invalidity based on functionality, because the design labels there were primarily functional. Very different from shoes in LG gear, where you can have a lot of running shoes and you've got different stripes and designs on them. There are alternative ornamental ways to practice the same function. What we're arguing here is that Apple is trying to claim, in a design patent, something that is a pure function needed to live in the smartphone world. You had smartphones that didn't copy all of these features before, and they worked fine, right?  I'm glad Judge O'Malley didn't tell us. Why did you have to make it look like theirs to make it work? Well, we don't concede that it does look like theirs if you properly construe theirs as limited to the particular design, the particular radii, the particular screen size, the particular placement of the speaker slot, the particular aspect ratio of the phones and the tablets. We don't concede that it looked like theirs. And by the way, counsel referred to the event in the district court where, supposedly, counsel was unable to distinguish an iPad 2 from a Galaxy Tab 10.1. I was the unfortunate counsel in that parlor game and I want to point out that she did distinguish the two. It was just commented that it took her a while. But the key reason why that was an inappropriate comparison, with all respect to Judge Poe, is that we're accused of infringing the 889 design patent. And the iPad 2 does not practice the 889 design patent. If you look at the 889, it's a great big fat thing compared to the touted thin iPad 2. Apple was late to the party in even claiming that the iPad 2 practices the 889. So I just want to say that's an additional reason why secondary considerations were properly excluded by Judge Poe as to any success of the iPad 2. But the key point here is that this is a preliminary injunction denial, abusive discretion review, clear error review. She made no legal error as to causal nexus. The causal nexus standard that she adopted is not new. It comes from Winter and the notion of repairing irreparable harm. To repair irreparable harm, you have to stop conduct that caused it. And without proof that copying the design patents was what caused lost market share, there is no proof of irreparable harm. Thank you, Your Honor. OK, thank you. And we will hear a couple of minutes of rebuttal. Let's see. Three minutes of rebuttal from Mr. Jacobs. Thank you, Your Honor. I'd like to return to the injunctive standard question because I think if we look back at why we're here, it is because of the eBay decision. Before eBay, this was relatively easy. And so what we're trying to do is apply eBay. And Robert Bosch addressed some of the misinterpretations of eBay that are out there. But the district court still misconstrued it. And you can see it in her reference to the small components issue, which is the hypothetical that the cup holder in the board raises. That language in the concurring opinion follows from the language in the concurrence that deals with the new industry of nonpractical inventors. You're talking about Justice Kennedy's concurrence. Yes, I'm sorry. The second concurrence. It follows from the predicate that a new industry has developed in which parties are not practicing the invention and are seeking exorbitant licensees based on this asymmetrical leverage that one gets from injunctive relief. And then it posits the hypothetical that the company that is the defendant has a small component and the plaintiff is seeking an injunction against that. But that is after having set it up that we're talking about companies that are not practicing the invention. And Robert Bosch clarifies this, but there's still some ambiguity out there. If we are following the Lee decision and we're following the rest of the concurrences, we are in a classic case here where an injunction should We have competitor-on-competitor, head-to-head, aggressive competition built on infringement, built on patents that the district court held were likely valid and likely infringed. And to go beyond that and ask for additional evidence of causation, absent some extreme asymmetrical situation, posited by your hypothetical, or absent an ability to deal with that extreme asymmetrical situation in balance of the hardships or the public interest factors, threatens to turn injunctive relief where you have patents on components of a bigger product to an exception. Because proving that any of those components drives consumer demand, whether exclusively or as a top 10, as against 10% or 25% of the consumers, is going to be difficult in very many cases. That turns the exclusionary right granted by patents into an exception in the case of patents that relate to products that have multiple components in them. And that can't be the intent of eBay. And I don't think a proper reading of Robert Bosch concludes that that's the right outcome here. Apple is looking for a little help from the intellectual property system. It is widely regarded as an innovative company. The designs here, as we demonstrated in the record, were regarded as beautiful. What we're asking Samsung to do is stop copying. There are other beautiful designs out there. There are just other beautiful designs in the record. There was a New York Times review yesterday of a Nokia phone that had come out that the reviewer said was gorgeous. That's what we're asking this court to do, to reinforce the creativity and the heartbreaking amount of effort that took place to come up with these products through a reasonable application of the intellectual property system. Thank you very much.